FILED

JUN - 4 2008

Clerk, U.S. District and
Bankruptcy Courts

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------x

JAWED AHMAD, )
    **Detainee,** )
    **United States Air Base at** )
    **Bagram, Afghanistan;** )
)
ABDUL BAQI, )
    **as the Next Friend of JAWED AHMAD,** )
)
        **Petitioners/Plaintiffs,** )
v. )
)
GEORGE W. BUSH, )
    **President of the United States** )
    **The White House** )
    **1600 Pennsylvania Ave., N.W.** )
    **Washington, D.C. 20500;** )
)
ROBERT GATES, )
    **Secretary of Defense** )
    **U.S. Department of Defense** )
    **1000 Defense Pentagon** )
    **Washington, D.C. 20301-1000;** )
)
JOHN DOE 1, )
    **Custodian of Petitioner; and** )
)
JOHN DOE 2, )
    **Custodian of Petitioner,** )
)
        **Respondents/Defendants.** )
)
**Respondents are all sued in their official** )
**capacities.** )
------------------------------------------------------------x

Case: 1:08-cv-00952
Assigned To : Friedman, Paul L.
Assign. Date : 6/4/2008
Description: Habeas Corpus/2255

**PETITION FOR A
WRIT OF HABEAS CORPUS**

## PETITION FOR A WRIT OF HABEAS CORPUS

1.    Petitioner JAWED AHMAD ("Petitioner Ahmad"), a civilian purportedly designated as an "enemy

combatant" by the United States Defense Department, is being held virtually *incommunicado* in military

custody at the detention facility located at the United States Air Base at Bagram, Afghanistan without

basis, without charge, without access to counsel, and without being afforded any fair process by which

he might challenge the legality of his designation and his detention.

2.      Petitioner Ahmad, who is in the custody of the United States, seeks the Great Writ. He acts on his own behalf and through his father, Petitioner Abdul Baqi, who is acting as his Next Friend. Though he has committed no wrong, Petitioner Ahmad has been held unlawfully and virtually *incommunicado* in military custody by Respondents at the United States Air Base in Bagram, Afghanistan ("Bagram detention facility") – for more than 6 months.

3.      Petitioner Ahmad is being held under color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as in violation of customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner immediately or to establish in this Court a lawful basis for his detention. This Court should also order injunctive and declaratory relief.

## I.
## JURISDICTION

4.      Petitioners bring this action pursuant to 28 U.S.C. §§ 2241(a), (c)(1) and (c)(3) and 2242, and invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; Articles I, II, and III of, and the Fifth and Sixth Amendments to the United States Constitution. Because they seek declaratory relief, Petitioners also rely on Fed. R. Civ. P. 57.

5.      This Court is authorized pursuant to 28 U.S.C. § 2241 to grant the Writ of Habeas Corpus and to entertain this Petition filed by Petitioner Ahmad's Next Friend, Petitioner Abdul Baqi, under 28 U.S.C. § 2242. This Court has the power to declare the rights and other legal relations of the parties under 28 U.S.C. § 2201; to effectuate and enforce declaratory relief by all necessary and proper means under 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction; and to issue all writs necessary or appropriate in aid of its jurisdiction under 28 U.S.C. § 1651. This Court is empowered to entertain this Complaint and Petition pursuant to the United States Supreme Court's rulings in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), and *Rasul v. Bush*, 542 U.S. 466 (2004).

6.      Notwithstanding the enactment of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600, this Court retains jurisdiction in this matter. *See, e.g.,* Minute Order, *Said v. Bush,*

No. 05-2384 (RWR) (D.D.C. July 2, 2007) (continuing stay in lieu of dismissing case); *Yaakoobi v. Bush*, No. 06-1683 (RWR) (D.D.C. July 2, 2007) (same); Minute Order, *Taher v. Bush*, No. 06-0184 (GK) (D.D.C. Sept. 13, 2007) (denying without prejudice government respondents' motion to dismiss for want of jurisdiction or, in the alternative, to transfer the petition to the D.C. Circuit); Minute Order, *Al Maqaleh v. Gates*, No. 06-1669 (JDB) 2007 WL 2059128 (D.D.C. July 18, 2007) (denying without prejudice government respondent's motion to dismiss for lack of subject matter jurisdiction).

## II.
## VENUE

7. Venue is proper in the United States District Court for the District of Columbia, as Respondent Gates resides in the district, a substantial part of the events or omissions giving rise to the claims alleged occurred in the district, and Respondent Gates is an officer or employee of the United States or an agency thereof acting in his official capacity. 28 U.S.C. §§ 1391(b); 1391(e).

## III.
## PARTIES

8. Petitioner Jawed Ahmad is a citizen of Afghanistan presently incarcerated and held in Respondents' unlawful custody at the Bagram detention.

9. Petitioner Abdul Baqi is Jawed Ahmad's father. Because his son cannot secure access either to legal counsel or to the courts of the United States, Petitioner Abdul Baqi acts as his Next Friend. A copy of Petitioner Abdul Baqi's Next Friend Authorization is attached hereto as Exhibit A.

10. Respondent George W. Bush is President of the United States and Commander-in-Chief of the United States Military. Respondents allege that Petitioner Ahmad has been seized and detained pursuant to the Military Order of November 13, 2001, promulgated by President Bush, or alternatively, pursuant to his asserted authority as Commander-in-Chief and the laws and usages of war. Accordingly, Respondent Bush is ultimately responsible for Petitioner Ahmad's unlawful detention.

11. Respondent Robert Gates is Secretary of Defense of the United States. Secretary Gates ordered the seizure and detention of Petitioner Ahmad, has maintained custody and control over the Petitioner, and therefore is Petitioner's direct, immediate, and ultimate custodian. Respondent Secretary Gates is sued in his official capacity.

3

12.  The Respondents designated as John Does are fictitiously-named subordinate officers of the United States armed forces who have been charged with the responsibility of maintaining and overseeing the physical custody of Petitioner Ahmad.

## IV.

### STATEMENT OF FACTS

13.  Petitioner Ahmad is not, nor has he ever been, an enemy alien, a lawful or unlawful belligerent, or a combatant of any kind under any definition adopted by the United States government in any civil or military proceeding.

14.  Petitioner Ahmad is not, nor has he ever been, an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who were engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld,* 542 U.S. 507, 516 (2004).

15.  Petitioner Ahmad had no involvement, direct or indirect, in the terrorist attacks on the United States on September 11, 2001, the ensuing armed conflicts in Afghanistan or Iraq, or any act of international terrorism attributed by the United States to Al Qaeda or any other terrorist organization.

16.  Petitioner Ahmad has not been afforded any procedures that would satisfy his rights under the most fundamental common law notions of due process, the Constitution, the laws and treaties of the United States, or customary international law.

17.  Since the United States seized Petitioner Ahmad, took him into military custody, and imprisoned him at the Bagram detention facility, the United States military has held him virtually *incommunicado* and without legal process. Upon information and belief, he has been interrogated repeatedly by agents of the United States Departments of Defense and Justice, though he has not been charged with an offense, nor has he been notified of any pending or contemplated charges. Upon information and belief, he has made no appearance before either a military or civilian tribunal of any sort, nor has he been provided counsel or the means to contact counsel. He has not been informed of his rights under the United States Constitution, the regulations of the United States Military, the Geneva Conventions, the Vienna Convention, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, or customary international law. Indeed, Respondents have taken the position

that Petitioner Ahmad should not be told of these rights. As a result, the detained Petitioner is completely unable either to protect, or to vindicate his rights under domestic and international law.

18.    Upon information and belief, the detained Petitioner promptly identified himself by correct name and nationality to the United States. He also requested that the United States provide him with access to his family and to legal counsel.

19.    Petitioner Ahmad is a 22 year-old native of Kandahar, Afghanistan who has been working as a journalist for the Canadian television media company, CTV.

20.    Petitioner Ahmad is a civilian. He is not, and has never been, a member of the armed forces of any country.

21.    Petitioner Ahmad is not, and has never been, a member of the Taliban or its army.

22.    Petitioner Ahmad is not, and has never been, a member of Al Qaeda or any other terrorist organization.

23.    Petitioner Ahmad has never taken up arms against the United States or any other country.

24.    Petitioner Ahmad has never participated, nor been involved in any way, with any attack against the United States or its allied forces in Afghanistan, or in any other country.

25.    Upon information and belief, Petitioner Ahmad has never been accused of any crime in Afghanistan or in any other country.

26.    Petitioner Abdul Baqi, Petitioner Ahmad's father, is a citizen of Afghanistan, where he currently resides.

27.    Petitioner Abdul Baqi first learned that his son was in the custody of United States military when he received a letter from his son via the International Committee of the Red Cross ("ICRC").

28.    Upon information and belief, Respondents redacted from the ICRC letters, or otherwise did not permit Petitioner Ahmad to relate, via the ICRC letters, the facts and circumstances of his seizure or how he came to be in Respondents' custody.

**Authorization for Use of Military Force**

29.    In the wake of the September 11, 2001 attacks on the United States, the United States, at the direction of President Bush, began a massive military campaign against the Taliban Government, then in power in

Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against those "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("AUMF").

30.     As Petitioner Ahmad did not participate in the armed conflict at any point in time, he is not properly detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or the AUMF.

**President Bush's Military Order**

31.     On November 13, 2001, President Bush issued a Military Order authorizing indefinite detention without due process of law. The Order authorizes Respondent Rumsfeld to detain anyone President Bush has "reason to believe":

i.      is or was a member of the organization known as al Qaida;
ii.     has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or
iii.    has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

*See* Executive Order, 66 Fed. Reg. 57,833, §2 (November 13, 2001). President Bush must make this determination in writing. The Order was neither authorized nor directed by Congress, and is beyond the scope of the Joint Resolution authorizing the use of military force passed by Congress on September 14, 2001.

32.     The Military Order vests the President with complete discretion to identify the individuals that fall within its scope. It establishes no standards governing the use of his discretion. Once a person has been detained, the Order contains no provision for him to be notified of the charges he may face. On the contrary, the Order authorizes detainees to be held without charges. It contains no provision for detainees to be notified of their rights under domestic and international law, and provides neither the right to counsel, nor the right to consular access. It provides no right to appear before a neutral tribunal to review the legality of a detainee's continued detention and no provision for appeal to an Article III

6

court. In fact, the Order expressly bars review by any court. For those detainees who will not be tried before a tribunal, the Order authorizes indefinite and unreviewable detention, based on nothing more than the President's written determination that an individual is subject to its terms.

33.     Petitioner Ahmad is not properly subject to the Executive Order, and, in any event, the Executive Order is unjust, *ultra vires*, and violates the laws, treaties, and Constitution of the United States. Petitioner has been, and is being, detained unlawfully purportedly pursuant President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

**The U.S. Secret Detention, Torture and Extraordinary Rendition Programs**

34.     Since 2001, the United States government has held many hundreds of men, women, and children at the American detention center in Bagram, Afghanistan. The U.S. has caused the disappearances of these people from their homes all over the world, seized them without cause, held them without charge, exposed them to inhuman treatment, and sequestered them away in facilities in a manner intended to deny them access to their families, communities, and counsel. All of the disappeared have been denied the most fundamental rights to human dignity and personal liberty, without so much as a nod acknowledging their U.S. domestic and international due process rights. While much judicial attention has been paid to the detentions of men at the U.S. Naval Base located in Guantanamo Bay, Cuba, the U.S. government has largely been able to maintain complete control over a similar concealed prison designed to exist beyond the law at Bagram.

35.     The extraordinary rendition, secret detention, and torture programs consist of the use of forced disappearances, secret detention at U.S.-run facilities around the world, the use of what government agencies describe as "enhanced interrogation techniques," and the transfer of detainees to countries that are known to use torture. Jane Mayer, *The Black Sites: A rare look inside the C.I.A.'s secret interrogation program*, New Yorker, Aug. 13, 2007; Dana Priest, *Covert CIA Program Withstands New Furor – Anti-Terror Efforts Continue to Grow*, Wash. Post, Dec. 30, 2005, at A1.

36.     Under this program, the CIA has exercised what administration officials argued is unfettered power to use interrogation techniques that violate domestic and international prohibitions against torture, and inhuman and degrading treatment. Jane Mayer, *The Black Sites: A rare look inside the C.I.A.'s secret*

7

*interrogation program*, New Yorker, Aug. 13, 2007.

37.    In establishing the CIA program, the United States negotiated agreements with foreign governments to set up U.S.-run detention facilities ("black sites") in those countries. John Barry, Michael Hirsch, Michael Isikoff, *The Roots of Torture*, Newsweek, May 24, 2005. These black sites are believed to have been located at various times in at least eight different countries, including possibly Thailand, Romania, Poland, Afghanistan, and Cuba (Guantanamo Bay). Human Rights Watch, *Statement on U.S. Secret Detention Facilities in Europe*, June 7, 2006, available at http://hrw.org/english/docs/2005/11/07/usint11995.htm.

38.    It has been widely recognized that "disappearances" are conductive to torture and other forms of human rights violations, and can themselves constitute torture or ill-treatment of "disappeared" persons and their families. *See, e.g.*, Louise Arbour, *In our Name and on our Behalf*, 55 Int'l & Comp. L.Q. 511, 520 (2006).

**The U.S. Detention Facility in Bagram, Afghanistan**

39.    Bagram Air Base, where Petitioner Ahmad is presently incarcerated, is subject to the exclusive jurisdiction and control of the United States military. *See* The Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic Republic of Afghanistan and the United States of America, executed on September 28, 2006, originally attached as Exhibit 1 to the Declaration of Colonel Rose M. Miller filed in *Ruzatullah v. Rumsfeld*, No. 06-CV-01707 (GK), and attached hereto as Exhibit B: "This Agreement *continues until the United States (or its successors) determine that the premises are no longer required for its use.*" (Emphasis supplied.)

40.    Colonel Miller states further in her Declaration that "Task Force Guardian, a subordinate unit of Combined Joint Task Force-76 [CJTF-76], is under United States national command and control. . . . [and] is responsible for operating the Bagram Theater Internment Facility, a Department of Defense ("DoD") detention facility located at the Bagram Airfield." Exhibit A at ¶3. According to Colonel Miller, the Commander of Task Force Guardian and Commander of Detention Operations, CJTF-76, is "responsible for all aspects of detention operations" there. *Id.*

41.    The detained Petitioner is in the physical and legal custody of the United States, at a U.S. military

facility that is subject to U.S. constitutional and statutory law, and answerable to the federal judiciary. *See Rasul v. Bush*, 542 U.S. 466 (2004).

42.     The United States has operated the Bagram detention facility since 2002. *See, e.g.*, Tim Golden & Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantánamo*, N.Y. Times, Feb. 26, 2006, at 1. There are currently more than 630 prisoners being held at the Bagram detention facility. While many of the prisoners being held there are believed to be Afghan citizens, there are many others who were seized from countries in Central Africa and Southeast Asia and who have been detained there over the last six years. *See* Tim Golden, *Defying U.S. Plan, Prison Expands in Afghanistan*, N.Y. Times, Jan. 7, 2008; Fisnik Abrashi, *US Lets Afghan Detainees, Families Talk*, A.P., Jan. 14, 2008.

43.     The U.S. State Department has described Bagram as a "temporary 'collection center' where some detainees stop over en route to their permanent location" – typically Guantánamo. *See* U.S. Department of State, *Information Memorandum re:     Nationalities at Bagram* (2002), *available at* http://www.aclu.org/torturefoia/released/120704.html; Emily Bazelon, *From Bagram to Abu Ghraib*, Mother Jones, Mar. 1, 2005, at 50.

44.     While Bagram Air Base has been in operation since 2002, relatively little has been made public about the detention facility where Afghans and many other foreign nationals detained by U.S. forces are held. *See, e.g.*, Tim Golden and Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantanamo*, N.Y. Times, Feb. 26, 2006. However, both military personnel and former detainees have described the prison conditions at Bagram to be far worse than those at Guantanamo. *Id.* at 2 (quoting a Defense Department official who had toured both detention facilities as stating "Anyone who has been to Bagram would tell you its worse."). *See also*, Nicholas D. Kristof, *Sami's Shame, And Ours*, N.Y. Times, Oct. 17, 2006 (quoting a former Bagram prisoner, presently detained at Guantanamo, describing the time he spent at Bagram as "the longest days of [his] life").

45.     Like the detainees who were transferred to Guantanamo in its early days, the Bagram detainees are reportedly held in primitive wire-mesh cages. *See* Golden and Schmitt, *A Growing Afghan Prison Rivals Bleak Guantanamo*, at p. 4. A former prisoner who had been detained for more than two years at Bagram described his cell as "a cage" like ones he had seen where they kept the animals at the Karachi

9

Zoo in Pakistan. *Id.* Former detainees have described sharing their "cages" – which often containing nothing more than a bucket to serve as a toilet – with dozens of other detainees. *Id. See also, e.g.,* Matthew Pennington, *Inmates detail U.S. prison near Kabul,* A.P., Oct. 1, 2006.

46.     One detainee has reported that bright lights shine around the clock, and those who try to cover their faces to block the lights in order to try to sleep are punished by being forced to assume and maintain "stress positions." Eliza Griswold, *American Gulag: Prisoners' Tales from the War on Terror*, Harper's Mag., Sept. 1, 2006, at 41.

47.     Loudspeakers are used to keep the prisoners awake. *See* Duncan Campbell & Suzanne Goldenberg, *America's Afghan Gulag,* Manchester Guardian Wkly., July 2, 2004 – July 8, 2004, at 15.

48.     In addition, detainees at Bagram are forbidden from looking at each other or talking, and are punished when caught violating the rule. Eliza Griswold, *American Gulag: Prisoners' Tales from the War on Terror*, Harper's Mag., Sept. 1, 2006, at 41 (quoting former detainee who recalled "if we talked to each other, we were sent into a dark room and had our hands tied").

49.     According to Afghan authorities, U.S. forces often arrest Afghans based on "wrong information," and detainees may be taken into custody based on nothing more than an accusation from another individual bearing a grudge, or having some interest in seeing the detainee imprisoned. *Id.*

50.     Apparently, the detainee may be taken into custody and remain there indefinitely -- solely for the purpose of interrogation. In February, 2006, Colonel James R. Yonts, the American military spokesman in Kabul, wrote this in response to an inquiry from the *New York Times*:  "We hold them for two reasons: to question them and get intelligence from them, *or* because they've committed violence against the coalition or the people of Afghanistan…We regularly review the status of the detainees, and *if a detainee has no intelligence value* and if we believe he will no longer attack the coalition or forces of the central government, we will release him..."  Sultan M. Munadi and Carlotta Gall, *Militant Inmates Riot and Seize Control of Cellblock in Afghan Prison*, N.Y. Times, Feb. 26, 2006 at 3 (emphasis supplied).

51.     Defense Department officials have admitted that the "[Department of Defense] system for releasing detainees whose intelligence value turned out to be negligible did not keep pace with the numbers [they]

10

were bringing in." *Id.*

52.    The staggering overcrowding of the Bagram prison has apparently lead the United States government to move forward with plans to build a new 40-acre detention complex within the Bagram military base. The new facility is intended to be able to hold as many as 1100 detainees if necessary and is estimated to cost more than $60 million dollars. *See* Eric Schmitt and Tim Golden, *U.S. Planning Big New Prison in Afghanistan*, N.Y. Times, May 17, 2008.

53.    Although the Bush administration had previously indicated its intention to downsize American detention operations in Afghanistan and transfer a majority of its war on terror detainees to the custody of the Afghan government for holding in the American-financed prison outside of Kabul – Block D of Policharky Prison – it has now reversed its decision, "underscor[ing] the daunting scope and persistence of the United States military's detention problem." Schmitt and Golden, *U.S. Planning Big New Prison in Afghanistan,* N.Y. Times, May 17, 2008.

54.    In fact, some detainees have been held at the Bagram facility without charge for as long as five years. *See* Fisnik Abrashi, *Red Cross: Change Needed at US Prison,* A.P., Apr. 14, 2008.

55.    According to military intelligence officials at Bagram, only a small fraction of the detainees held there were ever considered important or suspicious enough to be transferred to Guantánamo. *See* Tim Golden, *Army Faltered in Investigating Detainee Abuse,* N.Y. Times, May 22, 2005, at 1. Nevertheless, upon arrival, many detainees begin their stay at Bagram hooded, shackled, and isolated for at least 24 hours, and sometimes as long as 72 hours. *Id.*

56.    Human rights groups have also found that the treatment of detainees held in the Bagram detention facility evince a total lack of compliance with the Geneva Convention and international prohibitions against torture. *See* Duncan Campbell & Suzanne Goldenberg, *America's Afghan Gulag,* Manchester Guardian Wkly., July 2, 2004 – July 8, 2004, at 15 (quoting Human Rights Watch: "In some ways, the abuses in Afghanistan are more troubling than those reported in Iraq.... The detention system in Afghanistan, unlike the system in Iraq, is not operated even nominally in compliance with the Geneva conventions..."); *see also* Human Rights Watch, *World Report,* 2006 at 5 (noting that combatants seized in the United States' global war on terrorism are "unprotected by the Geneva Conventions" and that the

11

United States has adopted a "definition of torture that render[s] the prohibition virtually meaningless.").

57.  Former detainees have consistently described the use of abusive interrogation tactics that have been deemed to constitute torture and cruel, inhuman or degrading treatment.  Bagram detainees have reported being held in solitary confinement for up to eleven months straight, as well as being starved, beaten, kicked, left out in the freezing cold, and sexually humiliated.  Matthew Pennington, *Inmates detail U.S. prison near Kabul,* A.P., Oct. 1, 2006; Nicholas D. Kristof, *Sami's Shame, And Ours,* N.Y. Times, Oct. 17, 2006,- at 21.

58.  In fact, at least two detainees have died while in U.S. custody in Bagram.  *See* Tim Golden, *Army Faltered in Investigating Detainee Abuse,* N.Y. Times, May 22, 2005, at 1.  Documents leaked from an Army investigation revealed that the two men's deaths had been ruled homicides, contradicting the military's earlier assertions that both had died of natural causes.  *Id.  See also* Autopsy Reports, *available at* http://action.aclu.org/torturefoia/released/102405.

59.  Both of the detainees had been chained to the ceiling for days at a time and brutally beaten.  *See* Julian Borger, *Report Implicates Top Brass in Bagram Scandal*, Guardian (London), May 21, 2005, at 4.

60.  In one case, the detainee was reportedly killed over a five-day period by "destroying his leg muscle tissue with repeated unlawful knee strikes" that the medical examiner determined were so severe that "even if [the man] had survived, both legs would have [had] to be amputated."  Douglas Jehl, *Army Details Scale of Abuse in Afghan Jail*, N.Y. Times, March 12, 2005, at 1.

61.  The other detainee who died in custody was similarly tortured, and died of a pulmonary embolism from being beaten while he was chained to the ceiling by his wrists.  *Id.*  Medical examiners noted that the man's legs "had basically been pulpified" and looked as though they had been run over by a bus.  Julian Borger, *Report Implicates Top Brass in Bagram Scandal*, Guardian (London), May 21, 2005, at 4.

62.  Reports indicate that the deaths were not isolated incidents, but rather were part of a larger, systemic pattern of abuse at Bagram.  The Army Criminal Investigation Command revealed that prisoner abuse at Bagram went far beyond the two deaths.  The report described the abuse of one man who had been tortured by "kicks to the groin and leg, shoving or slamming him into walls/tables, forcing the detainee to maintain painful, contorted body positions during interview and forcing water into his mouth until he

could not breathe," and the abuse of another by a military interrogator who had "placed his penis along the face" of the detainee, and later "simulated anally sodomizing him (over his clothes)." Douglas Jehl, *Army Details Scale of Abuse in Afghan Jail*, N.Y. Times, March 12, 2005, at 1.

63.    Other Bagram detainees have also complained of acts of sexual brutality and of 'mock executions'. *See* Suzanne Goldenberg & James Meek, *Papers Reveal Bagram Abuse: Prisoners subjected to 'mock executions'; Photographs of detainees being sexually humiliated*, Guardian (London), Feb. 18, 2005, at 1 (reporting that soldiers "forcibly rammed a stick up [detainee's] rectum"). One detainee described being threatened with dogs, stripped and photographed "in shameful and obscene positions," and placed in a cage with a hook and a hanging rope, from which he was hung blindfolded for two days. *Id.*

64.    Reports indicate that many of the methods cited as a basis for the criminal charges, including chaining prisoners to the ceilings of isolation cells for long periods, were either standard practice at Bagram or well known to those who oversaw it. Tim Golden, *Abuse Cases Open Command Issues at Army Prison*, N.Y. Times, Aug. 8, 2005, at 1. One former guard said that he and other policemen were specifically instructed at Bagram on how to deliver the type of blows that killed the two detainees, and that such strikes were commonly used when detainees were being hooded or shackled. *Id.*

65.    An Army investigation following the deaths of the two detainees substantiated a Human Rights Watch investigation showing that beatings and stress positions were widely used. Jehl, *supra*, at 1 (quoting Human Rights Watch's finding that "far from a few isolated cases," abuse in Afghanistan was "the rule more than exception").

66.    In fact, many of the harsh interrogation techniques practiced at Abu Ghraib are believed to have originated in Bagram. *See* Major General George R. Fay, *AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade* (2004) ("Fay-Jones Report"), *available at* http://news.findlaw.com/hdocs/docs/dod/fay82504rpt.pdf. *See also* Emily Bazelon, *From Bagram to Abu Ghraib,* Mother Jones, Mar. 1, 2005, at 50 (noting that former head of interrogation unit at Bagram who was reassigned to Abu Ghraib implemented an interrogation policy that was "remarkably similar" to the one she had developed in Bagram).

67.    According to the Fay-Jones Report, these interrogation techniques are "not approved by military

doctrine or included in Army field manuals." Bazelon, *supra*, at 50.

68.    Unlike the prisoners held at Guantánamo, the men detained at Bagram have been successfully kept "out of sight, out of mind." Golden & Schmitt, *supra*, at 1 (quoting a Defense Department official). Their torture and cruel and inhuman treatment is thus compounded by the utter lack of due process there. As Jacob Kellenberger, President of the International Committee of the Red Cross, recently stated, prisoners at Bagram "don't know what the future brings, how long they will be there, and under what conditions they will be released." *See* Fisnik Abrashi, *supra*, at 1.

**Mr. Ahmad's Seizure and Detention**

69.    Petitioner Ahmad was seized by U.S. forces at the end of October 2007. According to media reports Petitioner Ahmad was seized at Kandahar Airport when he responded to a call to meet colleagues there from CTV, Canadian Television. Upon information and belief, the U.S. military is holding Petitioner Ahmad because it believes, based on the fact that he had telephone numbers and a video of Taliban leaders, that he had personal contact with these Taliban leaders. The U.S. military has now held Jawed in Bagram for six and one-half months, and has not charged him with any crime nor given him access to counsel.

70.    Petitioner Ahmad's situation is familiar in one important detail. Over the last three years, dozens of journalists have been detained by U.S. troops in both Iraq and Afghanistan. And while a number of them have been released after relatively short periods of detention, according to the Committee to Protect Journalists, *in at least eight fully documented cases, journalists have been held by U.S. forces for weeks or months without charge. See* Committee to Protect Journalists, "AP Photographer is latest in long list of U.S. detainees," Dec. 7, 2007. Several of the detainees were photojournalists who drew the military's attention because of what they had filmed or photographed. A copy of the CPJ Report is attached hereto as Exhibit C.

71.    Petitioner Abdul Baqi has no idea why his son was seized or when he will be released. He can only speculate as to his son's physical condition, mental status, or general well being, and continue to worry knowing that many of the prisoners eventually released from Bagram have been interrogated under torture by the U.S. Military while detained there.

14

72.  Since this his capture, Petitioner Ahmad's family has received messages from him through the International Committee of the Red Cross (ICRC).

## V.
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

(COMMON LAW DUE PROCESS AND THE DUE PROCESS CLAUSE
OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION –
UNLAWFUL DEPRIVATION OF PERSONAL LIBERTY)

73.  Petitioners incorporate the by reference all preceding paragraphs as if set forth fully herein.

74.  By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well as the Due Process Clause of the Fifth Amendment to the Constitution of the United States. Respondents' actions deny

75.  Petitioner Ahmad the process accorded to persons seized and detained by the United States military in times of armed conflict as established by, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

76.  To the extent that Petitioner's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

77.  Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

### SECOND CLAIM FOR RELIEF

(DUE PROCESS CLAUSE OF THE FIFTH
AMENDMENT TO THE UNITED STATES CONSTITUTION –
UNLAWFUL CONDITIONS OF PRETRIAL CONFINEMENT)

78.  Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

79.  By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioners to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

80.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

### THIRD CLAIM FOR RELIEF

(ARTICLE II OF THE UNITED STATES CONSTITUTION
-- UNLAWFUL DETENTION)

81.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

82.    Petitioner Ahmad is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind. The Executive lacks the authority to order or direct military officials to detain civilians who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522n.1 (2004).

83.    By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize Petitioner and transfer him to military detention, and by authorizing and ordering their continued military detention. Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Petitioner.

84.    The military seizure and detention of Petitioner by the Respondents is *ultra vires* and illegal because it is in violation of Article II of the United States Constitution. To the extent that the Executive asserts that Petitioner's detention is authorized by the Executive Order, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void on its face and as applied to Petitioner.

85.    To the extent that Respondents assert that their authority to detain Petitioner derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

86.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## FOURTH CLAIM FOR RELIEF

### (VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT – ARBITRARY AND CAPRICIOUS UNLAWFUL DETENTION)

87.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

88.     Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or who were not engaged in combat against the United States. *See, e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

89.     By arbitrarily and capriciously detaining Petitioner Ahmad in military custody in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

90.     Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## FIFTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA -- TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT)

91.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

92.     By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Petitioner Ahmad to torture and/or cruel, inhuman or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedures Act, 5 U.S.C. § 706(2).

93.     Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

17

## SIXTH CLAIM FOR RELIEF

### (FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION – VIOLATION OF THE RIGHT TO COUNSEL AND ACCESS TO THE COURTS)

94.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

95.   By denying Petitioner Ahmad access to counsel or the courts, Respondents have violated Petitioner's rights under the Fifth and Sixth Amendments to the U.S. Constitution.

96.   Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## SEVENTH CLAIM FOR RELIEF

### (INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW – ARBITRARY DENIAL OF DUE PROCESS)

97.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

98.   By the actions described above, Respondents have denied and continue to deny Petitioner Ahmad the process due to persons seized and detained by the United States military in times of armed conflict as establish by customary international humanitarian and human rights law as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

99.   Because Respondents are detaining Petitioner "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Petitioner's claim arises under 28 U.S.C.§ 2241, and he is entitled to habeas relief.

100.  Petitioners are also entitled to declaratory and injunctive relief as well as any other relief the Court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF

### (INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW – TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT)

101.  Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

102.  By the actions described above, Respondents have denied and continue to deny Petitioner Ahmad the

right to be from torture, cruel, inhuman or degrading treatment of all persons seized and detained by the United States military in times of armed conflict as establish by customary international humanitarian and human rights law -- as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

103.    Because Respondents are detaining Petitioner "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Petitioner's claim arises under 28 U.S.C.§ 2241, and he is entitled to habeas relief.

104.    Petitioners are also entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

**NINTH CLAIM FOR RELIEF**

(GENEVA CONVENTIONS<br>– ARBITRARY DENIAL OF DUE PROCESS)

105.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

106.    By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner Ahmad the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

107.    Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute enforceable claims under 28 U.S.C. § 2241 (c)(3).

108.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

109.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

**TENTH CLAIM FOR RELIEF**

(GENEVA CONVENTIONS
– TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT)

110.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

111.    By the actions described above, Respondents have denied and continue to deny Petitioners the right to be free from torture, cruel, inhuman or degrading treatment of all persons seized and detained in times of armed conflict as establish by customary international humanitarian and human rights law as established by specific provisions of the Geneva Conventions.

112.    Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute enforceable claims under 28 U.S.C. § 2241 (c)(3).

113.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

114.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

**PRAYER FOR RELIEF**

**WHEREFORE**, Petitioners pray for relief as follows:

1.    Grant Petitioner Abdul Baqi Next Friend status, as the Next Friend of Jawed Ahmad;

2.    Order Petitioner Jawed Ahmad released from Respondents' unlawful custody;

3.    Order Respondents to allow counsel to meet and confer with the detained Petitioner Jawed Ahmad, in private and unmonitored attorney-client conversations;

4.    Order Respondents to cease all acts of torture; cruel, inhuman and degrading treatment; and outrages upon the personal dignity of Petitioner Ahmad;

5.    Order Respondents to cease all interrogations of Petitioner Ahmad, direct or indirect, while this litigation is pending;

6.     Order Respondents to make a prompt return to the writ in accordance with 28 U.S.C. § 2243 and to the

extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary

hearing, at which Petitioners may adduce proof in support of their allegations;

7.     Order requiring the U.S. Government to refrain from transferring Petitioner Ahmad into the custody of

another Government other than his own without his prior written consent and that of his undersigned

counsel; and

8.     Order such other relief as the Court may deem necessary and appropriate to protect the detained

Petitioner Ahmad's rights under the United States Constitution, and the laws and treaties of the United

States.

Dated:        Palo Alto, California                      Respectfully submitted,
              June 3, 2008

                                                         *Barbara J. Olshansky*

                                                         Barbara J. Olshansky (NY0057)

                                                         Kathleen Kelly
                                                         International Human Rights Clinic
                                                         Stanford Law School
                                                         559 Nathan Abbott Way
                                                         Stanford, CA, 94305
                                                         Tel. 650.736.2312

                                                         Tina Monshipour Foster
                                                         International Justice Network
                                                         PO Box 610119
                                                         New York, NY 11361-0119
                                                         Tel. 917.442.9580

                                                         *Attorneys for Petitioners*

CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Pursuant to Local Civil Rule 83.2(g), I hereby certify that I am representing the
Petitioners in this action without compensation.

Dated: Palo Alto, California
      June 4, 2008

                                            _____
                                          Barbara Olshansky (DC Bar #NY0057)

# EXHIBIT A

### NEXT FRIEND AUTHORIZATION

My name is _Abdul Baqi_ (name of Next Friend), and I am a citizen of _Afghanistan_ (country). I am the _Father_ (example, brother, father, etc.) of _Javid Ahmad_ (Detainee Name), who is a citizen of _Afghanistan_ (country), currently being detained incommunicado by United States forces at Bagram prison in Afghanistan.

I have had the American legal concept of "Next Friend" explained to me in my native language of _Pashto_ (example Arabic, Pashto, etc.), and I know that _Javid Ahmad_ (detainee name) would want me to take legal action on his behalf to secure his release.

I hereby authorize U.S. human rights attorneys Tina Monshipour Foster and Barbara Olshansky of the International Justice Network, and any attorneys assigned by them, to file a case in U.S. courts seeking the release of prisoner _Javid Ahmad_ (name of detainee) and to take any other legal action in US or international venues that is necessary and appropriate to defend his fundamental human rights.

DATE: _12.03.08_

Signature of Next Friend:

Name of person taking authorization:

Signature of person taking authorization:

08 0952

**FILED**

JUN - 4 2008

**Clerk,** U.S. District and **Bankruptcy Courts**

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RUZATULLAH, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 06-CV-01707 (GK) |
| ) | |
| DONALD RUMSFELD, ) | |
| Secretary, United Stated Department of ) | |
| Defense, *et al.*, ) | |
| ) | |
| Respondents. | |

### DECLARATION OF COLONEL ROSE M. MILLER

I, Colonel Rose M. Miller, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I currently serve as Commander of Task Force Guardian, Combined / Joint Task Force Force-76 ("CJTF-76"), as well as Commander of Detention Operations, CJTF-76. The statements in this declaration are based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. CJTF-76 is headquartered at Bagram Airfield in Afghanistan. CJTF-76, along with Afghan National Security Forces, conducts full spectrum operations to defeat al Qaeda, the Taliban, and associated movements. CJTF-76 integrates joint, interagency and multinational forces partnered with the Afghans in order to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan.

3. Task Force Guardian, a subordinate unit of CJTF-76, is under United States national command and control. Task Force Guardian is responsible for operating the Bagram Theater

1

08 0952

**FILED**

JUN - 4 2008

**Clerk,** U.S. District and **Bankruptcy Courts**

Internment Facility ("BTIF"), a Department of Defense ("DoD") detention facility located at the

Bagram Airfield. I have served as the Commander of Task Force Guardian and Commander of

Detention Operations, CJTF-76, since December 2005. In this position, I am responsible for all

aspects of detention operations for CJTF-76.

### Bagram Airfield, Afghanistan

4. Bagram Airfield is located approximately forty miles north of Kabul in the Parwan

province of the Islamic Republic of Afghanistan ("Afghanistan"). In the military campaign

against al Qaeda and the Taliban regime in Afghanistan, American troops were deployed to the

base starting in late 2001 and early 2002, along with multinational armed forces, and had priority

use of the airfield for coalition operations. The United States' use of Bagram Airfield was and

is necessitated by its ongoing war against al Qaeda, the Taliban and their affiliates and

supporters.

5. U.S. and Coalition military operations are conducted from Bagram Airfield.

Currently, the nature of the United States' use of Bagram Airfield is pursuant to an

Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between

the Islamic Republic of Afghanistan and the United States of America, executed on September

28, 2006. See Exhibit 1 (Lease Agreement). This agreement follows similar such arrangements

dating back to at least 2003. Under this Agreement, Afghanistan, as the "host nation," consigns

all facilities and land located at Bagram Airfield "for use by the United States and coalition

forces for military purposes." This Agreement continues until the United States (or its

successors) determine that the premises are no longer required for its use.

6. A significant multinational presence exists at Bagram Airfield as part of CJTF-76's

2

mission. While the United States guards Bagram Airfield, there are numerous national compounds located within it. Each nation separately controls access to its respective compound on the Airfield. The United States does not have complete, plenary jurisdiction on Bagram Airfield.

7. Afghan citizens enter Bagram Airfield on a daily basis. These Afghans range from local nationals performing contracted work (such as cleaning services) to representatives of the Afghan government.

### The Bagram Theater Internment Facility

8. The United States and its multinational partners are conducting an ongoing military campaign against al Qaeda, the Taliban regime, and associated forces in Afghanistan. During the execution of this campaign, the U.S. Armed Forces and allied forces have captured or procured the surrender of thousands of individuals believed to be members or supporters of either al Qaeda or the Taliban. Since the war began in Afghanistan, the United States has captured, screened and released many individuals. A small percentage of these individuals are or have been detained at the Bagram Theater Internment Facility. The detention of these enemy combatants prevents them from returning to the battlefield and engaging in further armed attacks against innocent civilians and U.S. and coalition forces. Detention also serves as a deterrent against future attacks by denying the enemy the fighters needed to conduct war. Interrogations during detention enable the United States to gather important intelligence to prevent future attacks.

9. DoD has registered individuals held under its control at the BTIF with the

3

International Committee of the Red Cross ("ICRC"). The ICRC has regular access to this facility and conducts private interviews with detainees. Additionally, representatives of the Government of Afghanistan have access to Afghan detainees at the BTIF.

### Assessment of Enemy Combatants in Afghanistan

10. Detainees under DoD control in Afghanistan are subject to a review process that first validates whether an individual is an enemy combatant. This status (as an enemy combatant) is initially determined at the place of capture.

11. By direction of the Secretary of Defense, within 90 days of a detainee being brought under DoD control, the detaining combatant commander, or his designee, shall review the initial enemy combatant determination made in the field. Such review is based on all reasonably available and relevant information available on the date of the review and may be subject to further review based upon newly discovered evidence or information. If necessary for a proper review, the detaining combatant commander, or his designee, may interview witnesses, providing they are reasonably available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations. The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. After the initial 90-day status review, the detaining combatant commander, or his designee, is required, on an annual basis, to reassess the status of each detainee. If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released.

12. In Afghanistan, this review process is conducted by the Commanding General,

4

CJTF-76, under the authority delegated by the Secretary of Defense through the combatant

commander. As noted above, Secretary of Defense guidance requires a review of the detainee's

enemy combatant status by the 90-day point and annually thereafter. At the BTIF, however,

such reviews are usually conducted within 75 days of capture and every six months thereafter.

CJTF-76 is responsible for establishing the Enemy Combatant Review Board ("ECRB") to

accomplish these reviews. The ECRB is a panel of five commissioned officers who evaluate the

detainees' status and make a recommendation by majority vote to the Commanding General,

CJTF-76, or his designee as to detainees' status. ECRB decisions are based on information

derived from a variety of sources, including classified intelligence and testimony from

individuals involved in the capture and interrogation of the detainee. The specific implementing

guidance for the ECRBs is classified, as are the documents prepared regarding the ECRB's

evaluation of the detainee's status.

### Enemy Combatants at Bagram

13. Even if an individual is determined to be an enemy combatant following the reviews

discussed above, there are several ways in which the detainee can leave DoD custody in

Afghanistan.

14. The Government of Afghanistan sponsors a national reconciliation program designed

to allow combatants who are ready to put down their weapons to join in their country's progress

by living peaceful and productive lives in Afghan society. The ECRB process described above

nominates Afghan detainees from the BTIF for entry into the reconciliation program. Once

nominated, individuals are vetted and selected by a Government of Afghanistan commission for

return to their village elders and reintegration into society. After DoD releases detainees to the

5

custody of the Government of Afghanistan for participation in this program, the United States no longer exercises any custody or control over these former detainees.

15. In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, a significant percentage of the Afghan detainees at the BTIF is expected to be transferred to the Government of Afghanistan, likely within the next year. The United States is currently funding the renovation of an Afghan prison, the Afghan National Detention Center. The United States is also providing other aid to the Government of Afghanistan regarding the operation of this prison, both to facilitate these transfers and to ensure an Afghan detention capability which meets international standards. The prison is to be owned and operated by the Government of Afghanistan.

16. Under certain circumstances, the detaining combatant commander is authorized to permit the release of certain enemy combatants (including citizens of Afghanistan) from the BTIF to their home countries. The criteria and procedures for that program are classified. Following the release of these individuals, the United States no longer exercises any custody or control over these former detainees.

17. Some Afghan detainees and detainees who are nationals of third countries are expected to remain in DoD custody either at BTIF or through a transfer to the Guantanamo Bay Naval Base.

### Petitioner Ruzatullah

18. BTIF has no record of any individual with the exact name of Petitioner Ruzatullah detained at BTIF. An individual with a very similar name is currently detained at the BTIF, however his name is a common one in Afghanistan. Without additional information, we are

unable to conclude that this individual is the petitioner.

19. The ECRB last reviewed this detainee's enemy combatant status on August 24, 2006. Following that review, his status as an enemy combatant was again validated.

### Petitioner Haji Rohullah

20. The BTIF has no record of any individual with the exact name of Petitioner Haji Rohullah currently being detained at the BTIF.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __19__ November 2006.

ROSE M. MILLER
Colonel, U.S. Army
Commander, Task Force Guardian
Commander of Detention Operations,
Combined / Joint Task Force-76

7

**Exhibit 1**
**(Declaration of Colonel Rose M. Miller)**

PARWAN PROVINCE                                    DACA-AED-5-06-6559
                                                  BAGRAM AIRFIELD

## ACCOMMODATION CONSIGNMENT AGREEMENT

### FOR LANDS AND FACILITIES AT

### BAGRAM AIRFIELD

### BETWEEN

### THE ISLAMIC REPUBLIC OF AFGHANISTAN

### REPRESENTED BY

### HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK
### MINISTER OF DEFENSE
### OF THE OFFICE OF THE MINISTRY OF DEFENSE

### AND

### THE UNITED STATES OF AMERICA

This **ACCOMMODATION CONSIGNMENT AGREEMENT** made and entered into this 28th day of September 2006, by and between **THE ISLAMIC REPUBLIC OF AFGHANISTAN, REPRESENTED BY HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK, MINISTER OF DEFENSE, OF THE OFFICE OF THE MINISTRY OF DEFENSE,** hereinafter referred to as the **HOST NATION,** and The **UNITED STATES OF AMERICA,** hereinafter referred to as the **LESSEE,** or the **UNITED STATES:**

WITNESSETH THAT:

**WHEREAS:** The **UNITED STATES** and the **HOST NATION,** hereinafter referred to jointly as the **PARTIES,** wish to enter into an Accommodation Consignment Agreement, hereinafter referred to as the Agreement, whereby the **HOST NATION** consigns all facilities and land located at **BAGRAM AIRFIELD, PARWAN** owned by the **HOST NATION,** or **PARWAN PROVINCE,** or **PRIVATE INDIVIDUALS,** or **OTHERS.** for use by the **UNITED STATES** and Coalition Forces for military purposes; and,

**WHEREAS:** The **MINISTER OF DEFENSE,** is the bona fide representatives of the **HOST NATION** for all Real Estate matters legal or otherwise pertaining to or occurring at **PARWAN PROVINCE;** and has authority to execute Real Estate documents on behalf of **THE ISLAMIC REPUBLIC OF AFGHANISTAN;** and

**WHEREAS:** The **PARTIES** further desire that all previous Real Estate and use agreements at **PARWAN PROVINCE,** between the **UNITED STATES** and the **HOST NATION,** or **PARWAN PROVINCE,** or **PRIVATE INDIVIDUALS,** or **OTHERS,** will be terminated upon the execution of this Agreement by both **PARTIES.**

**NOW THEREFORE,** in accordance with the desires of the **PARTIES** and in consideration of the mutual benefits to be derived therefrom, the **PARTIES** hereto mutually covenant and agree as follows:

1. The **HOST NATION** hereby consigns to the **UNITED STATES** to have and to hold for the exclusive use of the **UNITED STATES** Forces land, facilities, and appurtances currently owned by or otherwise under the control of the **HOST NATION,** or **PARWAN PROVINCE,** or **PRIVATE INDIVIDUALS,** or **OTHERS,** at **PARWAN PROVINCE,** hereinafter referred to as "the Premises" described as: One parcel

HN_____

US _____

**PARWAN PROVINCE**                                    DACA-AED-5-06-6559
                                                      BAGRAM AIRFIELD

of land containing approximately 8082 jeribs (approximately 16,164,248 square meters) located within
PARWAN Province, Afghanistan, and more particularly described as located within the following grid
coordinates:

42SWD2165165842
42SWD2220765799
42SWD2285465102
42SWD2297564547
42SWD2297263721
42SWD2301863125
42SWD2309363085
42SWD2371563710
42SWD2437965919
42SWD2506864666
42SWD2653864898
42SWD2787565943
42SWD2722267302
42SWD2561568407
42SWD2587668650
42SWD2575668797
42SWD2609869452
42SWD2573668823
42SWD2549369261
42SWD2482269430
42SWD2481868906
42SWD2441469060
42SWD2420468236
42SWD2356868275
42SWD2265766138
42SWD2240365893
42SWD2274064648
42SWD2371364596
42SWD2384764764
42SWD2382964921
42SWD2275065491
42SWD2257165535
42SWD2248166374
42SWD2311267244
42SWD2430968936
42SWD2669664709
42SWD2701864970
42SWD2369868338

as shown in purple in Exhibit "A", attached hereto and made a part of this agreement, to be used for
LESSEE'S purposes.

2. The **UNITED STATES** shall have the right to assign this agreement to a successor nation or
organization. This agreement in its entirety shall apply to the **UNITED STATES** and the successor nations
or organizations, hereinafter referred to as "the Successor."

3. The **UNITED STATES** shall have the right to enter into a Lease or Local Administrative Agreement
with successor nations or organizations for any and all fixtures, additions, alterations, improvements, or
structures owned by the **UNITED STATES** and located on the property which is the subject of this
agreement.

4. The term of this Agreement shall commence the earlier the date of execution by the **HOST NATION**,
or 31 days from the date of this Agreement and shall continue until the **UNITED STATES** or its
successors determine that the Premises are no longer required for its use.

HN_____

US _____

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

5. The **HOST NATION** makes the Premises available to the **UNITED STATES** without rental or any other consideration for use of the Premises.

6. The **UNITED STATES** shall be responsible for obtaining and making payment of all other charges for utilities and services it deems necessary to its operations, including but not limited to heat, electricity, hot water, refuse collection, annual cleaning and adjustment of heating systems. Arrangements and payments of utilities and services used shall be made by separate contract.

7. The **UNITED STATES** shall have the right, during the existence of this Agreement, to make alterations and additions, including, but not limited to grade, condition, installing drainage facilities, place gravel or hard stand, attach fixtures, erect improvements and structures or signs, and remove all obstructions which may constitute a hindrance, in or upon the Premises. Any such fixtures, additions, alterations, improvements or structures, so placed in upon or attached to the said Premises, shall remain the property of the **UNITED STATES** and, at the option of the **UNITED STATES**, may be left in place, removed or otherwise disposed of by the **UNITED STATES**, except as otherwise directed in this Agreement. If the **UNITED STATES** elects to leave in place any or all of the said additions, fixtures, structures or improvements, it shall have no further obligation with respect to restoration of any of the Premises to the previous condition. Any such fixtures, structures or improvements abandoned by the **UNITED STATES** shall become the property of the **HOST NATION**.

8. The **MINISTER OF DEFENSE** hereby warrants and guarantees that the **HOST NATION** is the sole owner of the Premises and/or has the right, without any restrictions, to grant the use of the Premises. The **HOST NATION** will hold the **UNITED STATES** harmless against any claim arising out of the **UNITED STATES'** possession of land encompassed by the Premises. Any person that brings a claim for possession of land encompassed by the Premises will be directed to the **HOST NATION** through the **MINISTRY OF DEFENSE** or its representative, who shall process the claim and make a decision to accept the claim or deny the claim, whichever the **HOST NATION** deems appropriate. In cases where the **HOST NATION** makes a decision to honor the claim, the **HOST NATION** is responsible for payment. While **HOST NATION** adjudicates any claim by any third party, **HOST NATION**, authorizes the **UNITED STATES** to continue to with operations and maintain exclusive control of the area described in this Agreement

9. The **HOST NATION** covenants and warrants that the **UNITED STATES** shall have exclusive, peaceable, undisturbed and uninterrupted possession of the Premises during the existence of this agreement. The **UNITED STATES** shall hold and enjoy the Premises during the period of this agreement without any interruption whatsoever by the **HOST NATION** or its agents.

10. Any notice under the terms of this consignment agreement, including by the **UNITED STATES** to give notice of its intent to terminate the Agreement, shall be in writing signed by a duly authorized representative of the party giving such notice, and if given by the **UNITED STATES**, or the Successor in possession, a copy shall be addressed to:

HE GENERAL ABDUL RAHIM WARDAK
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
THE ISLAMIC REPUBLIC OF AFGHANISTAN
KABUL, AFGHANISTAN

and if given by the **HOST NATION**, shall be addressed to:

ATTN: CREST
CJTF76 CJ7
BAGRAM AIRFIELD, AFGHANISTAN          or,

U.S. ARMY CORPS OF ENGINEERS
SAVANNAH DISTRICT
ATTN: SASRE
100 WEST OGLETHORPE STREET
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889

HN_____

US _____

PARWAN PROVINCE                                      DACA-AED-5-06-6559
                                                     BAGRAM AIRFIELD

11. The **UNITED STATES** or the Successor in possession of the Premises shall have the right to terminate this agreement in whole or in part by providing **HOST NATION** written notice of its intent. If the Agreement is terminated in part, the terms and conditions of the Agreement remain in full force and effect for the remaining Premises.

12. If any Successor elects to terminate this Agreement, in whole or in part, during its use of the Premises, the **UNITED STATES** shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use of the surrendered Premises to the **HOST NATION**. The **UNITED STATES** shall have use of the surrendered Premises on the date of its notice to the **HOST NATION**. If the **UNITED STATES** does not provide said notice, the surrendered Premises shall revert to the possession of the **HOST NATION**.

13. This Agreement supersedes all previous agreements between the **UNITED STATES** and **HOST NATION** for the use of Bagram Airfield, including, but not limited to Accommodation Consignment Agreement numbered DACA-AED-5-06-472 dated 30 AUGUST 2006.

14. This Agreement is executed in English. A courtesy translation may be furnished to the **HOST NATION**. In the event of inconsistency between any terms and conditions of this Agreement and its translation, the English language version shall have precedence and control.

**IN WITNESS WHEREOF**, the **PARTIES** hereto have hereunto subscribed their names.

**FOR THE ISLAMIC REPUBLIC OF AFGHANISTAN:**


_____            Witness: _____
HE GENERAL ABDUL RAHIM WARDAK        (DATE)
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
KABUL, AFGHANISTAN


**AND**


**FOR THE UNITED STATES OF AMERICA:**


_____ 9-26-2006          Witness: _____
CHRISTOPHER D. DIRR              (DATE)
REALTY CONTRACTING OFFICER
CONTINGENCY REAL ESTATE SUPPORT TEAM (CREST)
PURSUANT TO AUTHORITY GRANTED BY THE SECRETARY OF THE ARMY
CJTF76 CJ7
BAGRAM AIRFIELD, AFGHANISTAN
DSN: (318) 231-2925


HN_____
US_____



# Reference Map: Bagram

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

JAWED AHMAD, Detainee, Bagram, Afghanistan
ABDUL BAQI, as Next Friend Petitioner                99999

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF          999999
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Barbara Olshansky
Stanford Law School
559 Nathan Abbott Way
Stanford, C.A. 94305
Tel. 650 736 2312

## DEFENDANTS

GEORGE W. BUSH, President of the United States
ROBERT GATES, Secretary of Defense
JOHN DOES 1-2, as Custodians of Petitioner

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT          11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

ATTORNEYS (IF KNOWN)

Case: 1:08-cv-00952
Assigned To : Friedman, Paul L.
Assign. Date : 6/4/2008
Description: Habeas Corpus/2255

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

O  1 U.S. Government        O  3 Federal Question
    Plaintiff                    (U.S. Government Not a Party)

Ⓞ  2 U.S. Government        O  4 Diversity
    Defendant                    (Indicate Citizenship of
                                 Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| O A. *Antitrust* | O B. *Personal Injury/ Malpractice* | O C. *Administrative Agency Review* | O D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| O E. *General Civil (Other)* | OR | O F. *Pro Se General Civil* | | |
|---|---|---|---|---|

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

**G. Habeas Corpus/ 2255**
- [X] 530 Habeas Corpus-General
- [ ] 510 Motion/Vacate Sentence

**H. Employment Discrimination**
- [ ] 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

**I. FOIA/PRIVACY ACT**
- [ ] 895 Freedom of Information Act
- [ ] 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

**J. Student Loan**
- [ ] 152 Recovery of Defaulted Student Loans (excluding veterans)

**K. Labor/ERISA (non-employment)**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Labor Railway Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

**L. Other Civil Rights (non-employment)**
- [ ] 441 Voting (if not Voting Rights Act)
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights
- [ ] 445 American w/Disabilities-Employment
- [ ] 446 Americans w/Disabilities-Other

**M. Contract**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholder's Suits
- [ ] 190 Other Contracts
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**N. Three-Judge Court**
- [ ] 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**
- (X) 1 Original Proceeding
- ( ) 2 Removed from State Court
- ( ) 3 Remanded from Appellate Court
- ( ) 4 Reinstated or Reopened
- ( ) 5 Transferred from another district (specify)
- ( ) 6 Multi district Litigation
- ( ) 7 Appeal to District Court from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Petition for Writ of Habeas Corpus pursuant to 22 U.S.C. sec. 2241

**VII. REQUESTED IN COMPLAINT**  [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____  Check YES only if demanded in complaint
JURY DEMAND:  YES [ ]  NO [X]

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES [ ]  NO [X]  If yes, please complete related case form.

DATE  June 4, 2008   SIGNATURE OF ATTORNEY OF RECORD  *Barbara J. Olshansky*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.